**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**PORTLAND DIVISION**

| | |
|---|---|
| HARVEY SALOUM, | ) |
|                Plaintiff, | )    No. 03:11-cv-00900-HU |
| vs. | ) |
| | ) **FINDINGS AND RECOMMENDATION** |
| TERRY WRIGHT, Tillamook Chief of | ) **ON MOTION FOR SUMMARY JUDGMENT** |
| Police, and CITY OF TILLAMOOK, | ) |
|                Defendants. | ) |

_____

J. Michael Porter
Jovita T. Wang
Miller Nash LLP
3400 U.S. Bancorp Tower
111 SW Fifth Avenue
Portland, OR 97204-3699

    Attorneys for Plaintiff


Gerald L. Warren
Law Office of Gerald Warren
901 Capitol St. NE
Salem, OR 97301

    Attorney for Defendants


1 - FINDINGS AND RECOMMENDATION

HUBEL, United States Magistrate Judge:

The plaintiff Harvey Saloum brings this action against Terry Wright in his capacity as Tillamook Chief of Police, and against the City of Tillamook, alleging violations of his civil rights in connection with his arrest on December 8, 2009, and events leading up to the arrest.[1]  Currently before the court is the defendants' Motion for Summary Judgment. Dkt. #45. Saloum opposes the motion. Dkt. #48. Neither party requested oral argument.  The undersigned submits the following Findings and Recommendation for disposition of the case pursuant to 28 U.S.C. § 636(b)(1)(B).

### SUMMARY JUDGMENT STANDARDS

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  In considering a motion for summary judgment, the court "must not weigh the evidence or determine the truth of the matter but only determine whether there is a genuine issue for trial." *Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 800 (9th Cir. 2002) (citing *Abdul-Jabbar v. General Motors Corp.*, 85 F.3d 407, 410 (9th Cir. 1996)).

The Ninth Circuit Court of Appeals has described "the shifting burden of proof governing motions for summary judgment" as follows:

> The moving party initially bears the burden of proving the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  Where the non-moving party bears the burden of proof at trial, the moving party

---

[1]Dkt. #29, Third Amended Complaint.

2 - FINDINGS AND RECOMMENDATION

need only prove that there is an absence of evidence to support the non-moving party's case. *Id.* at 325, 106 S. Ct. 2548. Where the moving party meets that burden, the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial. *Id.* at 324, 106 S. Ct. 2548. This burden is not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The non-moving party must do more than show there is some "metaphysical doubt" as to the material facts at issue. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 528 (1986). In fact, the non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor. *Anderson*, 477 U.S. at 252, 106 S. Ct. 2505. In determining whether a jury could reasonably render a verdict in the non-moving party's favor, all justifiable inferences are to be drawn in its favor. *Id.* at 255, 106 S. Ct. 2505.

*In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 387 (9th Cir. 2010).

## BACKGROUND FACTS

"How much time he saves who does not look to see what his neighbor says or does or thinks."[2]  This case arises from two neighbors - the plaintiff Harvey Saloum ("Saloum") and his next door neighbor Robin Boardman ("Boardman") - who failed to heed those wise words.  The following facts are undisputed, except where noted.

From approximately 2005 to 2009, Saloum ("Saloum") and his family lived in a single-family residence on Donald Place in

---

[2]Marcus Aurelius, second century Roman Emperor and philosopher.

3 - FINDINGS AND RECOMMENDATION

Tillamook, Oregon, next door to Boardman and his wife Shelley. Saloum and Boardman had known each other for over fifty years, and enjoyed a friendly relationship until they had a falling out sometime in 2007.  Around that time, Saloum began to suspect that Boardman was receiving Social Security disability benefits despite continuing to work.  Although not entirely clear, it appears that Saloum reported his suspicions to someone, resulting in an investigation into the matter; at least, Boardman believed the investigation was the result of Saloum's actions.[3]

In late December 2008, or early January 2009, Boardman had a conversation with the defendant Terry Wright, Chief of Police for the City of Tillamook, Oregon.  Boardman mentioned his suspicions regarding the audit of his disability benefits.  Boardman stated he thought Saloum was "crazy," and he claimed Saloum was following or stalking him.  Wright suggested to Boardman that he begin keeping a log of these incidents.  Boardman also installed a video surveil-lance system at his home.[4]

On January 5, 2009, Wright went to Saloum's residence and spoke with him about Boardman's allegations.  Saloum denied stalking Boardman, but indicated he was taking some photographs of Boardman to protect himself because he believed Boardman was "coming after [him] for slander."[5]  According to Saloum, Wright told him, "I have enough evidence against you that any judge would

---

[3]*See* Dkt. #29, Third Amended Complaint, ¶¶ 6-8.

[4]Dkt. #29, ¶ 8; Dkt. #47, Defendants' brief in support of their motion for summary judgment, p. 4.

[5]Dkt. #49-2, Depo. of Harvey Saloum, ECF p. 7; Dkt. #29, ¶ 8.

4 - FINDINGS AND RECOMMENDATION

file a stalking complaint against you."[6]  Wright explained some of the problems that could arise if a judge issued a stalking order against Saloum, and he explained the effect of a Stalking Protective Order, including the possibility that Saloum and his family would have to move.[7]  Because he did not want to be arrested, Saloum told Wright he would stop the activities that were upsetting Boardman.[8]

Saloum claims that over the next few months, the Boardmans would call Wright directly (as opposed to calling the general line for the police department), regarding "any perceived neighborly problems" between the parties.  Saloum cites as examples an occasion when his grandson accidentally kicked a ball into the Boardmans' yard, and an occasion when Saloum's granddaughter wrote with chalk on the sidewalk.  According to Saloum, Wright responded to these "insignifican[t]" complaints himself, going to Saloum's residence to confront Saloum about them.[9]

On or about March 12, 2009, Saloum contacted Wright to complain that Boardman had been exposing himself within view of Saloum's granddaughter's window, and also had exposed himself to Saloum's wife.  According to Saloum, Wright refused to talk with Saloum about the complaint.[10]  Wright dispatched Officer Nicholas

[6]Dkt. #49-2, Saloum Depo., ECF p. 8.

[7]Dkt. #47, Defs' brief, p. 4; Dkt. #29, ¶ 8.

[8]Dkt. #47, Defs' brief, p. 4; Dkt. #49-1, Depo. of Terrence John Wright, ECF p. 21.

[9]Dkt. #29, ¶ 9.

[10]Dkt. #49-2, Saloum Depo., ECF pp. 14-15.

5 - FINDINGS AND RECOMMENDATION

1  Troxel to follow up on Saloum's complaint.[11]  Saloum asked Officer
2  Troxel to talk with two witnesses - Doug Vogue and Pat Bunse - to
3  corroborate his statements.  Troxel spoke with Vogue, but could
4  never reach Bunse or Boardman.  Nevertheless, Troxel concluded that
5  no crime had been committed, and no further action was taken.[12]  On
6  May 27, 2009, Troxel also investigated some type of criminal
7  mischief complaint involving Saloum and Boardman.  Troxel was aware
8  at the time that Saloum and Boardman were "not getting along," and
9  had "had a falling out."[13]

10     Saloum also complained to Wright about a "For Sale" sign that
11  Boardman had "screwed into [a] telephone pole, in violation of a
12  city ordinance."[14]  According to Saloum, the sign was still nailed
13  to the pole five years later.[15]

14     Saloum claims he told Wright that it was actually Boardman who
15  was stalking him, rather than vice versa.  Saloum asserted Boardman
16  was not credible, and the "Boardmans were unreliable witnesses with
17  improper motives[.]"[16]  Saloum claims Wright was aware that the
18  Boardmans had made similar allegations regarding stalking and
19  criminal trespass against "a Spanish family that previously lived
20
21

22     [11]Dkt. #49-1, Wright Depo., ECF pp. 25-26; Dkt. #49-5, Depo.
23  of Nicholas Troxel, ECF p. 31.

24     [12]Dkt. #49-5, Troxel Depo., ECF p. 31.

25     [13]Dkt. #49-5, Troxel Depo., ECF p. 34.

26     [14]Dkt. #29, ¶ 10.

27     [15]*Id.*

28     [16]*Id.*, ¶ 11.

6 - FINDINGS AND RECOMMENDATION

in the same Tillamook residence as the Saloums."[17]  Saloum believes
that family moved away due to the Boardmans' allegations.[18]

On November 19, 2009, Saloum received a work order from C&D
Rentals, to replace a vent on a house located on property referred
to as the "Christie property," which is adjacent to the Boardmans'
property.[19]  According to Saloum, C&D Rentals owns the Christie
property and the house that needed the work.  The Boardmans lease
the Christie property, but not the house located on the property
that required the work.  Saloum claims that in order to reach the
house to replace the vent, he had to travel through a portion of
the Christie property.  Saloum parked his van near the house on the
Christie property.  Saloum claims Mrs. Boardman "came out and began
yelling at [him], stating that she was going to have him
arrested."[20]

Boardman called Wright to complain that Saloum "had parked his
van on their leased property."[21]  Wright went to the property to
speak to Saloum.  According to Saloum, Wright blocked his vehicle
from leaving, "and immediately declared that he was going to tow
Mr. Saloum's vehicle."[22]  Saloum states he attempted to explain to
Wright that he had a work order and permission to be on the
property, but Saloum claims Wright "refused to listen," and "picked

---

[17] *Id.*

[18] *Id.*

[19] *Id.*, ¶ 12.

[20] *Id.*

[21] Dkt. #47, p. 5 (citing Dkt. #46-2, Wright Depo., ECF p. 47.

[22] Dkt. #29, ¶ 12.

7 - FINDINGS AND RECOMMENDATION

1 up his phone and threatened that if he towed Mr. Saloum's vehicle,
2 he was also going to have Mr. Saloum arrested."[23]  According to
3 Saloum, during the time Wright was speaking with him, Mrs. Boardman
4 talked with the owner of the Christie property, confirmed that
5 Saloum had permission to be there to complete the work order, and
6 informed Wright of that fact, but Wright "still threatened to
7 arrest Mr. Saloum."[24]  Saloum claims Wright finally allowed him to
8 move his van off the property when Saloum decided not to complete
9 the work order.[25]

10     A few hours later, Boardman contacted Wright to report that
11 Saloum had followed him to the local branch of U.S. Bank.[26]  It took
12 Wright "[a] minute or so" to get to the bank.[27]  When he arrived,
13 he saw Saloum's "vehicle parked in front of the bank, and as
14 [Wright] came up on the corner, [Saloum] started to pull away."[28]
15 Wright did not see Boardman at the bank.[29]  Saloum claims he went
16 to the bank to use the ATM, and he never saw Boardman while he was
17 at the bank.[30]  The parties agree that soon after Saloum left the

18
19 _____
20     [23]Id.
21     [24]Id.
22     [25]Id.
23     [26]Dkt. #29, ¶ 13; Dkt. #47, p. 5 (citing Dkt. #46-2, Wright
24 Depo., ECF p. 53).
25     [27]Dkt. #46-2, Wright Depo., ECF p. 53.
26     [28]Id., ECF p. 54.
27     [29]Id.
28     [30]Dkt. #29, ¶ 13.

8 - FINDINGS AND RECOMMENDATION

bank, Wright pulled him over for failing to signal before turning.[31] According to Saloum, Wright asked him why he had been at the bank, and Saloum showed Wright his ATM receipt.  Saloum claims Wright accused him of following Boardman "and holding Mr. Boardman hostage at the U.S. Bank."[32]  Saloum claims Wright "threatened" him, telling him "he was not permitted to be at U.S. Bank while Mr. Boardman was there."[33]

Wright gives a different version of his conversation with Saloum.  At his deposition, Wright stated he and Saloum had a cordial conversation, calling each other by their first names, and Wright again tried to explain to Saloum that a "normal person" could take Saloum's actions as bothersome.  Wright claims he was trying to impress upon Saloum that he "really didn't want this to get to the point where one side or the other filed a stalking complaint or took more serious action against the other side or – either that or something bad happen."[34]

Saloum alleges, "It was later established that no phone calls were made to defendant Wright about any incident occurring at U.S. Bank but that defendant Wright and the Boardmans had made four calls to each other 45 minutes before defendant Wright had pulled Mr. Saloum over for the alleged traffic violation.  Defendant Wright also did not investigate any alleged allegations of stalking by reviewing the ATM footage, the alleged eye witness, or bank

---

[31]*Id.*; Dkt. #46-2, Wright Depo., ECF p. 54.

[32]Dkt. #29, ¶ 13.

[33]*Id.*

[34]Dkt. #46-2, Wright Depo., ECF p. 55.

9 - FINDINGS AND RECOMMENDATION

tellers.  He did not try to verify the alleged complaints made by the Boardmans and remained biased against Mr. Saloum."[35]

On December 1, 2009, Boardman petitioned for a Stalking Protective Order against Saloum, alleging Saloum was following him, intimidating him, spreading lies about him, and causing stress to Boardman and his wife.[36]  Saloum believed Wright "served as a witness" for Boardman's petition, but the Boardmans and Wright testified Wright was not involved in the petition.[37]  A Temporary Stalking Order was entered by the Tillamook County Circuit Court, and a show cause hearing was scheduled for December 8, 2009.[38] Among other things, the temporary order stated Saloum could "enter, remain and exit his residence without violating [the] order[, but he could not] stand on his property and stare at [Boardman, or] exit the easement when traveling to and from his residence."[39]  A Tillamook County Sheriff's Deputy served Saloum with the Temporary Stalking order on December 3, 2009, while Saloum was preparing to move from his residence.[40]  Saloum put the order in his pocket, and did not read it until a couple of days later.[41]

---

[35]Dkt. #29, ¶ 13.

[36]*Id.*; Dkt. #47, p. 5.  In Oregon, stalking protective orders are issued pursuant to ORS § 30.866.

[37]*Compare* Dkt. #29, ¶ 15, *with* Dkt. #47, p. 5 (citing depositions of Boardman and his wife, and Wright).

[38]Dkt. #46-2, ECF pp. 97-101.

[39]*Id.*, ECF p. 98.

[40]Dkt. #29, ¶ 15; Dkt. #47, p. 5.

[41]Dkt. #29, ¶ 15; Dkt. #47, pp. 5-6 (citing the Saloums' depositions).

10 - FINDINGS AND RECOMMENDATION

1    The Saloums began their move from Tillamook to Portland.  On
2 December 8, 2009, Saloum was at the Tillamook residence to finish
3 up the move and clean the residence.  The defendants claim Saloum
4 "drove his van to the residence, parked the van, unhooked his
5 utility trailer, and moved the trailer."[42]  However, the pages of
6 Saloum's deposition cited by the defendants in support of this
7 statement are not attached as exhibits to either party's motion
8 papers.  In any event, Mr. and Mrs. Boardman and an individual
9 named Steve Mathies claim they watched Saloum unhook his utility
10 trailer, and "drive[] his van well into the driveway of Mr. Board-
11 man in violation of the Stalking Protective Order."[43]  Boardman
12 claims Saloum knew exactly where the property line was between his
13 and Saloum's property because Saloum and Boardman worked together
14 to build a fence between their properties.  In addition, Boardman
15 claims the property line is clearly delineated by a surveyor's
16 marker.[44]  Boardman claims he called the police immediately after
17 he saw Saloum drive onto his property.[45]  Boardman eventually talked
18 with Wright and reported that he had seen Saloum unhook his
19 trailer, and then drive "straight in" onto Boardman's property,

20

21

22

23      [42]Dkt. #47, p. 6 (citing Saloum Depo. at 141-42).

24      [43]*Id.* (citing Dkt. #46-1, Boardman Depo., ECF pp. 88-89, 93);
25 *see* Dkt. #46-1, Boardman Depo., ECF pp. 91-93.

26      [44]*Id.* (citing Dkt. #46-1, Boardman Depo., ECF p. 89; Dkt. #46-
27 1, Saloum Depo., ECF p. 16).

28      [45]Dkt. #47, pp. 6-7 (citing Dkt. #46-1, Boardman Depo., ECF pp.
93-95).

11 - FINDINGS AND RECOMMENDATION

1    where Saloum allegedly sat for about 30 seconds before backing out
2    again.[46]

3        Wright first learned of Boardman's complaint when he returned
4    to his office after handling another matter.  Because Boardman
5    alleged Saloum had violated a stalking protective order, Wright
6    went to the courthouse and obtained a copy of the stalking order,
7    which he had been unaware of before that time.[47]  He then returned
8    Boardman's phone call, and also called and spoke to Mr. Mathies.
9    According to Wright, Boardman told him Saloum "had pulled his white
10   van into their property about 25 to 30 feet, at least, the length
11   of the full-size van, and then backed out and pulled onto his own
12   property."[48]  Boardman indicated this had been witnessed by himself,
13   his wife, and Mr. Mathies.[49]   Mathies gave an almost identical
14   account of the events.[50]

15       Wright went to Saloum's residence to confront him about
16   Boardman's allegations.  He did not have a warrant for Saloum's
17   arrest.[51]  According to Wright, he did not obtain a warrant because
18   violation of a stalking order is "a mandatory arrest" under Oregon
19
20
21

22       [46]*Id.*, p. 6 (citing Dkt. #46-1, Boardman Depo., ECF p. 92); *see*
23   Dkt. #46-1, Boardman Depo., ECF p. 96.

24       [47]Dkt. #46-2, Wright Depo., ECF pp. 61-65.

25       [48]*Id.*, ECF p. 64.

26       [49]*Id.*

27       [50]*Id.*, ECF pp. 66-67.

28       [51]Dkt. #46-2, Wright Depo., ECF p. 73.

12 - FINDINGS AND RECOMMENDATION

law.[52]    When he arrived, he saw a van and a car in Saloum's driveway.  The door to Saloum's residence was open, but Saloum was not visible.  Wright knocked, and Saloum appeared and walked up to the door.  According to Wright, he told Saloum he was there because of a report that Saloum had been on the Boardmans' property.  He read Saloum his rights, and told him that he was under arrest.[53] Saloum claims Wright immediately stated he was under arrest before telling him why.[54]  Saloum claims he had just returned from running errands, including a trip to a local recycling center.[55]   When Wright stated Saloum was under arrest, Saloum asked for permission to make one phone call, and to put away some tools that were lying outside the Saloum residence.  Wright claims that normally would not be allowed, but he "went ahead and took the high road and allowed [Saloum] to make a phone call and then to start putting stuff away."[56]   While he was waiting for Saloum, Wright called Boardman to clarify how far Saloum had pulled onto the Boardman property.  Wright claims Boardman told him Saloum had pulled almost all the way up to Boardman's garage.[57]  When Wright told Saloum of Boardman's allegation, Saloum denied having been on the Boardmans' property, and claims he asked Wright to check the footage from the

---

[52]*Id.*  *See* ORS § 133.310(3) (mandating arrest of a person believed to have violated a properly filed and served stalking protective order).

[53]*Id.*, ECF pp. 69-70.

[54]Dkt. #29, ¶ 16.

[55]*Id.*

[56]Dkt. #46-2, Wright Depo., ECF p. 70.

[57]*Id.*

13 - FINDINGS AND RECOMMENDATION

Boardmans' surveillance camera which would verify Saloum's version of the events.[58]   According to Saloum, Wright never attempted to view the surveillance footage, and the Boardmans later destroyed the footage.[59]   Boardman testified in his deposition that he, his wife, and Mr. Mathies viewed the security footage on his DVR, but he was unable to make a copy of it due to his "operator inability."[60]

Wright placed Saloum under arrest, handcuffed him, and took him to the Tillamook County Jail.[61]   Saloum was not permitted to take his headache medication while he was in the jail.  After his release at 4:18 p.m., Saloum took his medication.[62]

Wright's police report for December 8, 2009, indicates Boardman called to report Saloum's alleged actions at "0942."[63] Saloum claims he attempted to show Wright receipts indicating he was at the recycling center between 9:19 a.m. and 10:13 a.m., but Wright refused to "acknowledge [this] explanation and proof."[64] Saloum alleges Wright initially came to his Tillamook residence at about 10:00 a.m., but found Saloum was not home, so he returned "around 11:48 a.m., no less than two minutes after Mr. Saloum had

---

[58]Dkt. #29, ¶ 17.

[59]*Id.*

[60]Dkt. #46-1, Boardman Depo., ECF p. 92.

[61]Dkt. #46-2, Wright Depo., ECF pp. 70-71; Dkt. #29, ¶¶ 16, 19.

[62]Dkt. #47, p. 7 (citing Dkt. #46-1, Saloum Depo., ECF p. 34); *see* Dkt. #46-1, Saloum Depo., ECF pp. 34-35.

[63]Dkt. #46-2, ECF p. 83.

[64]Dkt. #29, ¶ 18.

14 - FINDINGS AND RECOMMENDATION

returned to his residence."[65]   Saloum alleges Wright failed to investigate Boardman's report prior to arresting him, and refused to speak with "potential witnesses about exculpatory evidence."[66] He argues Wright intentionally omitted to include these facts in his police report because they would have "shown that Mr. Saloum did not violate the protective stalking order."[67]

After Saloum bonded out of jail, he asked Wright if he could return to his Tillamook residence to finish moving out.  According to Saloum, Wright threatened him with a $30,000 fine if Boardman "even thought that Mr. Saloum was looking at him."[68]  Saloum claims a witness, Doug Vogue, overheard his conversation with Wright. Saloum contacted a friend who worked for the City of Tillamook, and according to Saloum, his friend contacted Wright and arranged for Saloum to be able to finish moving out of his Tillamook residence.[69]

A formal charge was lodged against Saloum on December 17, 2009, for allegedly violating a stalking order by coming into Boardman's visual presence.[70]   The case was tried to a jury on September 14, 2010, and Saloum was acquitted of the charge.[71] Circuit Judge Rick W. Roll, who presided over the criminal trial, also presided over the civil contempt proceeding against Saloum for

---

[65]*Id.*

[66]*Id.*

[67]*Id.*

[68]*Id.*, ¶ 20.

[69]*Id.*

[70]Dkt. #46-1, ECF pp. 38-39.

[71]Dkt. #29, ¶ 21; Dkt. #47, p. 8.

15 - FINDINGS AND RECOMMENDATION

his alleged violation of the stalking protective order.   On October 11, 2010, Judge Roll issued a written opinion[72], finding the Boardmans had proved that Saloum had violated the stalking order by knowingly engaging in repeated and unwanted contact with the Boardmans, with an intent to alarm or coerce Boardman and his immediate family.   Saloum was ordered to pay the Boardmans' attorney's fees in connection with the civil proceeding, and Judge Roll ordered Saloum to submit to a mental health evaluation, and any treatment directed by the evaluator.[73]   Saloum alleges Wright gave inconsistent testimony during the criminal and civil proceedings, deliberately contradicting his prior police reports.[74]

Saloum further alleges he was in Tillamook on November 1, 2010, and Boardman followed him, driving by the place where Saloum was staying at least five times.   Saloum claims he reported this to the Tillamook police, but no officer ever returned his phone call. He also alleges Boardman showed up unannounced at Saloum's place of worship in Portland on occasion.   Saloum reported this to Wright, and according to Saloum, "Wright informed [him] that Mr. Boardman could follow Mr. Saloum and have Mr. Saloum arrested."[75]

Saloum claims he suffered economic damages as a result of having to move from his Tillamook residence due to Wright's actions.   He also claims he "suffered mental and physical anguish,

---

[72]Dkt. #46-2, ECF pp. 104-13.

[73]*Id.*

[74]Dkt. #29, ¶ 22.

[75]*Id.*, ¶ 23.

16 - FINDINGS AND RECOMMENDATION

frustration, inconvenience, and humiliation," as a result of Wright's actions.[76]

### SALOUM'S CLAIMS

Based on the above facts, Saloum brings three claims under 42 U.S.C. § 1983, for violations of his constitutional rights: (a) "Arrest Without Probable Cause," in which Saloum asserts a claim based on Wright's allegedly "illegal and unconstitutional" conduct, and a claim against the City of Tillamook due to Wright's position as "a policymaker for the City"; (2) "Malicious Prosecution," alleging Saloum's prosecution was based on Wright's false testimony, and his "incomplete and inaccurate police report," depriving Saloum of "equal protection of the law and property without due process of law"; and (3) "Equal Protection Violation," alleging Saloum was treated differently because of his ethnic background.

The defendants move for summary judgment on each of Saloum's claims, arguing Wright had probable cause to arrest Saloum for violation of the stalking protective order; because probable cause existed, the ensuing criminal proceedings against Saloum did not constitute malicious prosecution; and Wright did not treat Saloum differently from others due to his ethnic background. Further, Wright claims he is entitled to qualified immunity. Regarding Saloum's claims against the City, the City argues Saloum has failed to show there was any formal governmental policy, or longstanding practice or custom, to support liability under *Monell v. New York*

---

[76]*Id.*, ¶ 24.

17 - FINDINGS AND RECOMMENDATION

1  *Dep't of Social Servs.*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d
2  611 (1978), nor has Saloum established any failure of training for
3  the City's police officers that would support liability.

4

5                          ***DISCUSSION***

6       I address Saloum's third claim first because the facts
7  indicate it is totally baseless.  Saloum, whose national origin is
8  Middle Eastern, bases his disparate treatment claim on the fact
9  that Wright and the other Tillamook Police officers are Caucasian,
10 and they "established a clear pattern of providing services to the
11 Boardmans, who were Caucasian, while simultaneously denying equal
12 services to Mr. Saloum[.]"  Dkt. #48, p. 26.  Saloum has failed to
13 offer evidence to show the existence of a genuine issue for trial
14 on this claim.  He has not, for example, cited instances of
15 racially-suggestive slurs or derogatory comments made by Wright or
16 other Tillamook officers.  At Saloum's deposition, he was asked if
17 any of the Tillamook police officers treated him in a way he felt
18 was dismissive because of his race or discriminated against him.
19 Saloum responded, "Absolutely not."[77]   Saloum's wife Lesley
20 similarly testified she did not believe Wright had discriminated
21 against Saloum due to his ethnic background.[78]  Saloum has offered
22 nothing more than "naked assertion[s]" devoid of "further factual
23 enhancement" to support this claim.  *Iqbal*, 556 U.S. at 678, 129
24 S. Ct. at 1949.  The defendants' motion for summary judgment should
25 be granted as to Saloum's Third Claim.

26

27      [77]Dkt. #46-1, Saloum Depo., ECF p. 17.

28      [78]Dkt. #46-1, Lesley Saloum Depo., ECF pp. 55-56.

18 - FINDINGS AND RECOMMENDATION

1    Turning to Saloum's false arrest and malicious prosecution
2  claims, both claims turn on whether Wright had probable cause to
3  arrest Saloum for violating the stalking protective order.  *See*
4  *Biolchini v. City of Bend*, 2010 WL 5891613 at *4 (D. Or. Dec. 28,
5  2010) (Coffin, MJ) ("To move forward on 42 U.S.C. § 1983 and state
6  law false arrest claims, a plaintiff must establish that his arrest
7  was not supported by probable cause.") (citing *Cabrera v. City of
8  Huntington Park*, 159 F.3d 374, 380 (9th Cir. 1998); *Bacon v. City
9  of Tigard*, 81 Or. App. 147, 147 (1986) "(clarifying that probable
10 cause is a complete defense to a false arrest claim)").  In another
11 case involving the alleged violation of a stalking protective
12 order, Chief Judge Aiken of this court recently discussed the
13 standards for determining whether probable cause exists:

14            Probable cause to arrest exists when the
             facts and circumstances within the arresting
15           officer's knowledge are sufficient to warrant
             a prudent person to believe that a suspect has
16           committed, is committing, or is about to com-
             mit a crime. *United States v. Hoyos*, 892 F.2d
17           1387, 1392 (9th Cir. 1989).  The question is
             whether the arresting officer's actions are
18           objectively reasonable in light of the facts
             and circumstances confronting him, without
19           regard to his underlying intent or motivation.
             *Graham v. Connor*, 490 U.S. 386, 397[, 109
20           S. Ct. 1865, 1872, 104 L. Ed. 2d 443] (1989).

21 *Wilson v. Lane County Sheriff's Office*, slip op., 2012 WL 6738279
22 at *3 (D. Or. Dec. 21, 2012).

23    Here, the facts under which Wright acted are not in dispute.
24 Wright testified that upon receipt of Boardman's complaint, he
25 verified the existence and terms of the temporary stalking
26 protective order, and he spoke with Boardman, and also with the
27 third-party witness Mathies.  Under Oregon law, a peace officer is
28 specifically directed to make a warrantless arrest and take a

19 - FINDINGS AND RECOMMENDATION

person into custody if the officer has probable cause to believe that a stalking protective order has been issued; the order has been served properly, and proof of service has been filed[79]; and the "person to be arrested has violated the terms of that order." ORS § 133.310(3). Here, the facts are sufficiently developed for the court to conclude Wright had an objectively reasonable belief that Saloum had violated the temporary stalking protective order. Therefore, Saloum's false arrest claim fails. In addition, because lack of probable cause is one of the elements Saloum must prove to prevail on his malicious prosecution claim, *see Blandino v. Fischel*, 179 Or. App. 185, 191, 39 P.3d 258, 261 (2002), that claim also fails. The defendants' motion for summary judgment should be granted on Saloum's First and Second Claims.

Further, even if Wright erred in concluding that probable cause existed to arrest Saloum, he nevertheless would be entitled to qualified immunity if his decision was reasonable, albeit mistaken. *See Hunter v. Bryant*, 502 U.S. 224, 228-29, 112 S. Ct. 534, 537, 116 L. Ed. 2d 589 (1991) (citation omitted). The United States Supreme Court has held that "[t]he qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter*, 502 U.S. at 229, 112 S. Ct. at 537 (internal quotation marks, citation omitted). The *Hunter* Court explained that "[t]his accommodation for reasonable error exists because

---

[79]As noted above, a Tillamook County Sheriff's Deputy served Saloum with the Temporary Stalking order on December 3, 2009. Saloum has not raised any issue about the filing of the proof of service.

20 - FINDINGS AND RECOMMENDATION

1  officials should not err always on the side of caution because they
2  fear being sued." *Id.* (internal quotation marks, citation
3  omitted). As discussed above, the court finds Wright's decision to
4  arrest Saloum was reasonable. Saloum has presented no credible
5  evidence that Wright knowingly violated the law. Thus, Wright is
6  entitled to qualified immunity concerning his arrest of Saloum for
7  violating the temporary stalking protective order.

8      Similarly, because Saloum has failed to show that his
9  constitutional rights were violated, there is no basis for the
10 City's liability. He has failed to offer even a shred of evidence
11 that the City of Tillamook had some official policy or custom that
12 resulted in a deprivation of his constitutional rights. *See*
13 *Monell*, 436 U.S. at 690-91, 98 S. Ct. at 2035-36 ("[T]he touchstone
14 of [a] § 1983 action against a government body is an allegation
15 that official policy is responsible for a deprivation of rights
16 protected by the Constitution. . . .").

17     In conclusion, the court finds Saloum has failed to show the
18 existence of any genuine issue for trial on any of his claims. I
19 therefore recommend the defendants' motion for summary judgment be
20 **granted.**

21

22                          ***SCHEDULING ORDER***

23     These Findings and Recommendations will be referred to a
24 district judge. Objections, if any, are due by **February 25, 2013.**
25 If no objections are filed, then the Findings and Recommendations
26 will go under advisement on that date. If objections are filed,
27 then any response is due by **March 14, 2013.** By the earlier of the
28

21 - FINDINGS AND RECOMMENDATION

1  response due date or the date a response is filed, the Findings and

2  Recommendations will go under advisement.

3        IT IS SO ORDERED.

4                              Dated this 6th day of February, 2013.

5

6                              /s/ Dennis J. Hubel

7                              _____
                               Dennis James Hubel
8                              Unites States Magistrate Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

22 - FINDINGS AND RECOMMENDATION